UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

LEIGH ANN HESS,                         )
                                        )
            Plaintiff,                  )
                                        )
    vs.                                 )    Case No. 4:14CV1593 CDP
                                        )
CAROLYN COLVIN                          )
Acting Commissioner of Social Security, )
                                        )
            Defendant.                  )

## MEMORANDUM AND ORDER

This is an action for review of the Commissioner's decision denying Leigh

Ann Hess's application for a period of disability and disability insurance benefits

under Title II of the Social Security Act (the Act), 42 U.S.C. §§ 405(g), *et seq*.

Judicial review of the Commissioner's final decision under Title II is available

under Section 205(g) of the Act.  42 U.S.C. § 405(g).  Because I find that the ALJ

made improper credibility determinations, I will remand for rehearing.

## BACKGROUND

On August 13, 2010, plaintiff Leigh Ann Hess filed an application for a

period of disability and disability insurance benefits under the Act, alleging

disability beginning January 6, 2009.  Hess alleged disability due to chronic severe

migraine headaches, fibromyalgia, clinical depression, and anxiety.  Tr. 181.  Her

claim was denied, and Hess requested a hearing before an Administrative Law Judge (ALJ).[1]  On May 6, 2013, following a hearing, the ALJ found Hess not disabled as defined under the Act through the date of the ALJ's decision.  On July 10, 2014, the Appeals Council denied Hess's request for review, and the ALJ's decision now stands as the final decision of the Commissioner.

## MEDICAL EVIDENCE BEFORE THE ALJ[2]

On September 5, 2002, Hess sought treatment from Dr. Alan Hagan to establish a primary care physician.  Dr. Hagan noted that she had been diagnosed with progesterone deficiency and severe clinical depression.  He also noted that Hess had a "history of severe migraines which were classified as menstrual, however, two to three months ago she underwent hysterectomy and has not had a migraine since."  Dr. Hagan noted that she had tried beta-blockers, Calan, and Midrin without much relief.  Her medications included Imitrex when needed for migraine,[3] Vicodin when needed for migraine,[4] Prozac,[5] and Premarin.[6]  Her migraines are terminated with Imitrex if treated early.  Tr. 620.

---

[1] Missouri participates in a truncated procedural program that eliminates the reconsideration step.  *See* 20 C.F.R. § 404.906.  Under that program, Hess's case proceeded directly to ALJ from initial denial.

[2] Although I have reviewed the entirety of the record, I only set forth those portions that are particularly relevant to the issues raised on appeal.

[3] Imitrex is a selective serotonin receptor agonist that is used to treat the symptoms of migraines without preventing new migraines from forming.  National Institutes of Health, Medline Plus (hereinafter, "Medline Plus"), https://www.nlm.nih.gov/medlineplus/druginfo/meds/a601116.html (last revised July 15, 2014).

From September 15, 2002 through July 2005, Hess sought treatment at emergency departments for migraine headaches at least nine times; Hess was initially administered Imitrex, though the treatments varied.[7]  On November 26, 2002, Hess again reported to Dr. Hagan for follow up from a recent Emergency Room visit for migraines.  Hess requested a prescription for Imitrex by injection, which she had received at the ER, because the oral version no longer worked.  Dr. Hagan prescribed the injectable Imitrex and Maxalt for migraines.  Tr. 632.  On June 17, 2003, Dr. Hagan continued her prescriptions for Maxalt and Premarin; additional prescriptions included Wellbutrin.[8]  Tr. 655–66.  On July 26, 2003, Hess

---

[4] Vicodin is a combination of hydrocodone (an opiate pain reliever) combined with acetaminophen (an analgesic pain reliever) that is used to treat severe pain.  Medline Plus, https://www.nlm.nih.gov/medlineplus/druginfo/meds/a601006.html (last revised Oct. 15, 2014) (hydrocodone); Medline Plus, https://www.nlm.nih.gov/medlineplus/druginfo/meds/a681004.html (last revised Aug. 15, 2014), (acetaminophen).

[5] Prozac is a selective serotonin reuptake inhibitor that is used to treat depression.  Medline Plus, https://www.nlm.nih.gov/medlineplus/druginfo/meds/a689006.html (last revised Nov. 15, 2014).

[6] Premarin is a hormone replacement medication that contains Conjugated Estrogens and Methyltestosterone.  Medline Plus, https://www.nlm.nih.gov/medlineplus/druginfo/meds/a682922.html (last revised Aug. 1, 2010).

[7] September 15, 2002; November 17, 2992; July 10, 2003; July 26, 2003; November 10, 2003 (twice); January 25, 2004; March 29, 2004; July 5, 2004; July 14, 2005.  Tr. 598, 623, 626, 658, 661, 679, 683, 700, 708, 721.

[8] Wellbutrin is an anti-depressant.  Medline Plus, https://www.nlm.nih.gov/medlineplus/druginfo/meds/a695033.html (last revised Sept. 15, 2014),

was treated with morphine and Phenergan.[9]  Tr. 662.  On November 10, 2003, Hess was administered Demerol[10] and Phenergan.  She was given those drugs again on March 29, 2004.  Tr. 709.  On July 5, 2004, Hess was treated with Imitrex, morphine, Phenergan, Toradol,[11] and Benadryl.  Tr. 722.

Hess obtained a noncontrast CT head scan on November 10, 2003 after reporting to the ER for migraine headache.  The CT was negative.  Tr. 682.  She re-reported the same day after her treatment was unsuccessful.  Tr. 684.

On February 3, 2004, Hess obtained a Neurology Consultation with Dr. J. Michael Hatlelid.  Dr. Hatlelid noted that the headaches might begin with an aura that sometimes manifests as a "glob" of white light to her left; the aura may or may not be followed by headache.  Her migraines are unpredictably caused by clothing touching her left shoulder blade area, and she may have pain in front of her left ear, which crosses to nose and eye.  There is usually light, noise, and smell sensitivity accompanied by nausea and vomiting.  Without medication, the pain lasts up to three days.  Prior to hysterectomy in 2002, headaches were premenstrual.  Both

---

[9] Phenergan treats allergies, prevents and controls nausea and vomiting, and is used to relax and sedate patients.  Medline Plus,
https://www.nlm.nih.gov/medlineplus/druginfo/meds/a682284.html (last revised Jan. 1, 2011).

[10] Demerol is a narcotic pain reliever.  Medline Plus,
https://www.nlm.nih.gov/medlineplus/druginfo/meds/a682117.html (last revised Oct. 1, 2010).

[11] Toradol is a nonsteroidal anti-inflammatory drug (NSAID) that is used for short-term relief of moderately severe pain.  Medline Plus,
https://www.nlm.nih.gov/medlineplus/druginfo/meds/a693001.html (last revised Oct. 1, 2010).

Imitrex tablets and shot no longer help. Tr. 703. Dr. Hatlelid diagnosed her as having migraine with or without aura and added a prescription for Imitrex nasal spray.

In March 2004, Hess saw Dr. Hagan for migraine and depression follow-ups. Dr. Hagan noted that Hess saw a Dr. Elliston, who prescribed Topamax[12] for migraines and that Dr. Hatlelid approved the Topamax. Tr. 707.

From January 2008 through November 2008, Hess received monthly counseling sessions at Advance Psychiatric Services from Doctor Erica Montgomery and then from Theresa Eschmann, a licensed professional counselor. Notes from Dr. Montgomery reflect that she had treated Hess for at least the year before this period, although the record does not contain any materials from those dates. *See* Tr. 322. Notes from this period reflect that Hess's headaches and moods were better, although Hess missed at least one appointment due to migraine. Tr. 320. Hess's narcotic pain medication was cancelled due to addiction and she was placed on Cymbalta, which was increased in dose at least once for pain and headaches.[13] *Id.*; Tr. 318. Her non-psychiatric medications included Vistaril for

---

[12] Topamax is used to prevent migraine headaches but will not relieve pain of already occurring headaches. <u>Medline Plus</u>, https://www.nlm.nih.gov/medlineplus/druginfo/meds/a697012.html (last revised Jan. 15, 2015).

[13] Cymbalta is used to treat depression, generalized anxiety disorder, fibromyalgia, and nerve pain. <u>Medline Plus</u>, https://www.nlm.nih.gov/medlineplus/druginfo/meds/a604030.html (last revised Nov. 15, 2014).

nausea, Premarin, Axert as needed for migraine, Topamax, Medrol dose-pack as needed for migraine cycles, and DHE/Indomethacin as needed for migraine. Tr. 317. On April 30, 2008, Hess reported a headache-free week. Tr. 314. Hess cancelled an appointment in July 2008 due to headache. In August 2008, Hess reported no side effects from her medications. Tr. 299.

Records from March 2009 through January 2011 show that Hess sought treatment from Dr. James W. Banks at the Ryan Headache Clinic at Mercy Hospital. Notes from March 17, 2009, state Hess had ten headaches total in the month, had five days with migraine attacks, and was disabled four days due to headaches. Hess took her triptan or DHE or ergot medication ten days. On the five bad days, Hess was in bed for one to two days. On days without headaches, Hess feels good. Hess stopped working on February 26 "due to headaches, fibro, [and] chronic pain. And is doing better, much less stress." The notes also indicate Hess was keeping headache diaries. Tr. 357–58.

Notes from May 2009 show that Hess had eighteen days with any headache, eighteen days with migraine attacks, was disabled eighteen days, and took her triptan or DHE or ergot medication eighteen days. She kept a headache diary. Hess was diagnosed with, *inter alia*, chronic pain syndrome, chronic headache, insomnia, anxiety state, and depressive disorder (not elsewhere classified). Tr. 366.

On June 17, 2009, Hess was reported to have migraine without aura, "fibro," and depression/anxiety. Headache intensity is typically moderate, with ten migraines per month and three of less-severe headaches. She is not keeping a migraine diary and denies side effects to medication. Notes show that she was on Estradiol,[14] among other medications. Tr. 370–71. Other notes from June 17, 2009, show that she had eighteen headache days, eighteen migraine days, was disabled eighteen days, and was keeping track of headaches on her calendar. Tr. 375.

Notes from August 17, 2009, show that she had migraine without aura, twenty migraines per month, and that Hess noted weather changes are problematic. Hess had six days per month in bed all day. Usually taking two headache capsules on onset will work, but she has to go to bed for four hours. Hess does keep a migraine diary, but she did not bring it with her. Tr. 381. Hess was diagnosed with chronic pain syndrome, chronic headache, and depressive disorder, not elsewhere classified, and anxiety, among others. Tr. 382–84. Other notes show twenty-two days of headache, twenty-two days of migraine, and twenty-two days disabled due to headache. Tr. 385.

---

[14] Estradiol is an estrogen hormone-replacement drug. Medline Plus, https://www.nlm.nih.gov/medlineplus/druginfo/meds/a682922.html (last revised Aug. 1, 2010).

Notes from October 21, 2009, show that Hess was not keeping a migraine diary.  She has migraine without aura.  Hess spent ten days in bed in the past month with two additional days not from headache but because she was "wiped out."  She had ten additional days of less-severe headaches.  Tr. 391.  Conflicting notes show she had twenty-two days of headache, twenty-two days with of migraines, ten days disabled, and was keeping headache diaries.  Tr. 396.

Notes from December 16, 2009, state that Hess has migraine without aura and is not keeping a migraine diary.  She has nineteen migraine attacks per month and zero days of less-severe headaches.

Notes from January 20, 2010, conflictingly show that Hess both is and is not keeping a headache diary.  She had eighteen days with any headache, eighteen days with migraine, and was disabled due to headache eighteen days.  She did not have any triptan or DHE or ergot medication, but did take ibuprofen.  Other notes say she had fifteen days migraine per month.  Diagnoses include migraine with intractable migraine, chronic headache, chronic pain syndrome, fibromyalgia syndrome, and depressive disorder, not elsewhere classified.  Dr. Banks prescribed Milnacipran ("Savella")[15] for her fibromyalgia and discontinued Cymbalta.  Dr. Banks also noted that her headache capsules are being overused and "are arguably

---

[15] Milnacipran is a selective serotonin and norepinephrine reuptake inhibitor used to treat fibromyalgia.  Medline Plus, https://www.nlm.nih.gov/medlineplus/druginfo/meds/a609016.html (last revised Apr. 15, 2014).

not effective if you have to take two and you have to go to bed.  Could be perpetuating the headache problem."  Dr. Banks recommended she take one headache capsule at onset of headache and go to bed.  Tr. 417.

Notes from March 17, 2010, show that Hess's headaches are doing much better.  The Savella has been very beneficial for fibro and may be helping the headaches.  They state that Hess had only had fourteen headaches in the past four weeks, and they were more spread out over the month "(usual is 18–20)."  Tr. 424. Other notes show Hess had fourteen days with any headache, fourteen days with migraine, zero days disabled due to headache, and on fourteen days, she took triptan, DHE, or ergot med.  Hess was keeping headache diaries.  Tr. 427.

Notes from June 9, 2010, state that Hess has migraine without aura, eleven migraines per month and daily of less severe headaches "that is minimal."  Patient does not keep a migraine diary.  Other notes show eleven days of any headache, eleven days with migraine, eleven days disabled due to migraine, eleven days taking triptan or DHE or ergot medication, two days taking non-specific medication (Excedrin, etc.), and show she was keeping a migraine diary.  Tr. 435.

Notes from October 29, 2010, indicate eighteen days any headache, eighteen days migraine, two days disabled, sixteen to eighteen days taking triptan or DHE or ergot medication, and that Hess was not keeping headache diaries. Other notes show two migraine attacks per month and sixteen of less severe

headaches. Hess reported that "she is on a 'good schedule' which has helped her headaches and fibromyalgia.'" Tr. 480.

On January 5, 2011, Hess again sought treatment. Notes show eighteen to twenty days any headache, eighteen to twenty days migraine, three days disabled due to headache, eighteen to twenty days taking triptan or DHE or ergot medication, and that Hess was not keeping a migraine diary. Other notes show fifteen migraine attacks per month and four days of less severe headaches. Hess said she uses headache capsules and anti-nausea medication and will go to sleep. Tr. 490. Diagnoses included migraine with aura with intractable migraine, depressive disorder, chronic headache, insomnia, fibromyalgia syndrome. Tr. 493.

On March 2, 2011, Hess reported that her fibromyalgia had slightly worsened. She had sixteen days of any headache, sixteen migraine days, was disabled due to headache four days, and took triptan or DHE or ergot medication sixteen days. Notes are conflicting on whether Hess kept a migraine diary. On June 14, 2011, Hess reported twenty days with any headache, twenty days of migraine, eight days disabled due to headache, and twenty days taking triptan or DHE or ergot medication. Tr. 511.

Records from Hess's September 21, 2011, appointment show she had twenty days with any headache, twenty days of migraine, four days disabled, and took a triptan or DHE or ergot medication twenty days. The notes state she

maintained headache diaries and that she kept off NSAIDs due to problems with kidneys. Hess used some prednisone that was prescribed to her daughter and it "worked great" for her headaches. She used it eight times over the summer. Tr. 521. Hess was diagnosed with migraine, chronic pain syndrome, fibromyalgia syndrome, depressive disorder not elsewhere classified, insomnia, anxiety, and chronic headache, among others. She was prescribed Kenalog, a "long-acting" steroid that "works as a preventative" for headaches. Tr. 528.

Notes from Hess's December 21, 2011, appointment show she had twenty days with any headache, twenty days migraine attacks, was disabled six days due to headache, and took a triptan, DHE, or ergot medication twenty days. The notes state Hess was not keeping a migraine diary and was experiencing migraine without aura. She was negative for weight loss, malaise/fatigue, neck pain, chest pain, tingling, tremors, and focal weakness. Tr. 532.

On February 3, 2011, Dr. Banks completed a residual functional capacity questionnaire. He listed Hess's diagnoses as including fibromyalgia, chronic migraine, and chronic pain syndrome and projected that these would cause lifelong debilitation. Clinical findings and symptoms included diffuse myofascial pain, holocephalic moderate to severe headaches, fatigue, excessive daytime sleepiness, and depression. Dr. Banks noted that her pain was chronic, daily, of variable intensity, and refractory to numerous treatment trials. This pain "persists at

moderate to full debilitation despite multi-modal therapy (meds, pt, chiropractic, behavioral therapy)." Tr. 460. Hess's impairments can be expected to last at least twelve months, she is not a malingerer, and her depression, anxiety, and somatoform disorder affect her condition. Dr. Banks estimated that Hess can sit for thirty minutes at a time before needing to change positions and that she can sit or stand/walk for less than two hours each. He found her incapable of even "low stress jobs and estimated that she would have such frequent absences that no employer could retain her. Dr. Banks specifically stated, "She is not employable." Tr. 462 (emphasis in original). Dr. Banks noted that these conditions existed as far back as 2006, when he began treatment. Tr. 464.

Hess's primary care physician, Dr. Christopher Abercrombie, completed a physical residual functional capacity questionnaire dated February 29, 2012. He diagnosed her with migraines, fibromyalgia, and pain. Dr. Abercrombie stated that he began treating Hess in August 2004 and had done so every eight weeks. Her symptoms included headache, severe pain, nausea, vomiting, [unreadable] and generalized myofascial pain, which were evidenced by generalized myofascial [unreadable] and discomfort with sitting for office visits and [unreadable] to get up and move around. Dr. Abercrombie stated Hess was not a malingerer and her physical condition was affected by her depression and anxiety. Tr. 574. Dr. Abercrombie estimated that Hess's pain would be severe enough to interfere with

concentration and attention necessary to perform simple work tasks between 34% and 66% of an eight-hour workday. Dr. Abercrombie assessed that because "low stress triggers her migraines," Hess was incapable of even low stress jobs. Hess could sit and stand/walk each less than two hours per eight-hour workday. Tr. 575. She could sit for thirty minutes at a time, after which she needs to readjust, stretch, and move around. *Id.* He estimated that Hess's impairments would likely cause "good days and bad days" and that she would be absent more than four days per month. Tr. 577. Dr. Abercrombie wrote that Hess would need to avoid temperature extremes as well as wet/humidity, which trigger migraines and cause increased fibromyalgia pain. Tr. 578.

Hess received a neurological exam from Dr. Patrick Hogan, a neurologist, on August 7, 2012. Hess reported chronic migrainous headaches frequently every day, which are caused by rain, snow, or stress. These are occasionally associated with nausea or vomiting and appear suddenly. Hess also complained of chronic pain syndrome/fibromyalgia. Hess was tender with very light palpation of the skin on neck and had tenderness of the arms and legs on light palpation. Strength was normal in all four extremities. Dr. Hogan assessed Hess as having migrainous headaches (fibromyalgia) and a normal neurologic examination. Tr. 731–32.

Dr. Hogan also performed an assessment of Hess's ability to do work-related activities. Hess could continuously lift and carry up to twenty pounds and

frequently lift and carry up to fifty pounds.  Dr. Hogan found Hess to be able to stand, sit, and walk for at least seven hours without interruption, could continuously use her hands and feet, and occasionally engage in all postural and environmental limitations.  Tr. 741–43.

Hess's medical records also include a headache calendar ranging from July 2010 to December 2011.  The calendar has a large number of "X"s on it and other notations such as "prednisone," "dose pack," "snow," "rain," "X-3," and "X-3 with ice."  The cover letter for the calendar states, "Dr. Banks has me keep this calendar as a record of each time I have even the slightest of headaches, and take medication for them, so that I can report this to his office . . . .  Each 'X' is a day I had a headache of some sort, either mild or severe, . . ."  Tr. 579–97.

## TESTIMONY BEFORE THE ALJ

At the hearing, the ALJ asked Hess whether her headache diaries were kept contemporaneously or whether they were created after the fact.  Hess responded that she did not originally keep them and then later started.  When asked why "you told the doctor you're not keeping them," Hess responded, "He has a different form from his office, and I use my calendar."  Tr. 46.  Every X on the calendar marks when she took one of her special, non-prophylactic headache pills.  Tr. 75.  The X-3 means she took three pills that day.  Tr. 76.  The prednisone and dose pack

entries reflect that she took a steroid; her doctors do not like her to take them and so they reflect particularly severe headaches. Tr. 76.

When asked why she is disabled, Hess responded that she cannot determine when she will have a headache. Her doctors have not found a pattern. Although she takes medicine prophylactically, she still has headaches. Tr. 48.

Hess testified that before she became disabled, she did clerical work full time and then reduced to part time in possibly 2007, before finally stopping work in March 2009. Tr. 49. Hess said that at her last job, she was calling off or leaving work four to five times per month. Tr. 50. Her headaches made her nauseated and caused blurry vision, and her medicine makes her drowsy and dizzy. Tr. 51. The headaches start on the left side of her face or behind her eye and build to a throbbing behind Hess's ear or in her temple area. Tr. 52. When the headaches start, sometimes her medicine will work within a half-hour; when the medicine fails, the headache becomes severe within an hour. Tr. 53.

She can take up to three headache pills within 24 hours. They make her dizzy and sleepy, particularly if she takes more than one pill. When she takes more than one pill in a day, she has diarrhea the next day. The pill will successfully resolve her headache two to three times per week. Hess's headache will be so severe it requires more than one pill once per week. Tr. 57.

Hess described her most recent attack. She awoke in the middle of the night on Sunday with a headache and took a pill. When she awoke Monday morning, the headache persisted and she took a pill and went back to sleep until midmorning. The headache remained severe, and she took a third pill and went back to sleep. Hess woke in the afternoon and used an ice pack; the headache remained until Monday evening and she was nauseated. On Tuesday, Hess was exhausted and suffered from diarrhea. She felt "worn out" and "like I've had the flu." Tr. 58. She rested on the couch on Tuesday. Tr. 59.

These severe headaches occur every two or three weeks and usually when the weather has changed to rain. Tr. 59. Cold weather also causes some form of a headache, whether mild or severe. She has headaches daily in the winter. Tr. 60.

Hess used to go to the emergency room for headache relief, but has not gone since starting Dr. Banks's prescribed headache pills in 2008 or 2009. Tr. 61. She takes two preventative medications in addition to the responsive headache pill. Tr. 62. Hess has no side effects to those medications or from the others she is taking. Tr. 62. Lying down in a dark, quiet room without smells and while using an ice pack helps alleviate the migraines. Tr. 63. Hess estimated that without lying down, there is a 60 to 75 percent likelihood that her headache would not go away. Tr. 67.

Hess testified that she has been having headaches since age 18. She says she can no longer work because the headaches have become more severe and the nausea, vomiting, and diarrhea have become more of a problem. Tr. 68.

When not suffering migraines, Hess is able to do household chores and cook. She does not carry laundry upstairs because it is too heavy. Her arms, shoulders, and knees hurt when she carries things. Hess can easily lift and carry a quart of milk on a regular basis; she does not buy milk in larger quantities for that reason. Tr. 65. Hess can sit on a hard chair for 30 to 45 minutes before needing to readjust or stand up. She can stand on a hard floor for 30 to 45 minutes without walking; on grass, those times increase by 15 minutes. Tr. 66.

Hess's husband since January 2005 testified. He said that he knows when Hess suffers migraines because he can see it in her face and she shields her eyes. She gets severe headaches at least once per week and less severe headaches two to three times a week. Tr. 72. He thinks the headaches are under more control because she does not go to the E.R. "all the time." Tr. 73. He estimates she would miss at least one day per week of work and sometimes could not work at all. Tr. 74. The headaches are triggered by cold, stormy weather, and snow. Tr. 74.

Although a vocational expert (VE) was present, the ALJ declined to have the VE testify at the hearing. The ALJ noted that disability would likely come down to impairment, "because . . . if you can't make it to work two or three times a

month at best, . . . you're not going to be able to sustain work." The VE concurred. Tr. 80.

The ALJ requested more information on the "headache pill" prescribed by Dr. Banks, because "it's like [Hess is] not getting the right treatment. I mean she's talking about something that's strictly left-sided. That's right there a flag to me as a non-medical person." Tr. 79. The ALJ also noted that there was nothing in the record on fibromyalgia trigger testing or any records from a rheumatologist. Tr. 44.

## ALJ'S DECISION

The ALJ determined that Hess meets the insured status requirements of the Act through December 31, 2013 and had not engaged in substantial gainful activity since the alleged onset date. The ALJ found that Hess's only one severe impairment was migraine headaches. In reaching this determination, the ALJ noted that the record lacked the objective evidence necessary to establish fibromyalgia and chronic pain syndrome as medically determinable impairments under Social Security Ruling 12-2p. The ALJ found Hess to have the nonsevere medically determinable mental impairments of depression and anxiety.

The ALJ determined that none of Hess's impairments or combination of impairments meets or is the medical equivalent of a listed impairment under 20 C.F.R. Part 404, Subpart P, Appendix 1. The ALJ summarily rejected Hess's

argument that her impairments should be equivalent to listing 11.02 or 11.03 because "agency regulations preclude the undersigned from finding medical equivalence without the testimony of a physician." Tr. 15.

The ALJ determined Hess's residual functional capacity (RFC) to include the full range of work at all exertional levels, restricted only to a low stress environment, occasional work-related judgment, and occasional interaction with others. In reaching that determination, the ALJ acknowledged that Hess's sole severe impairment – migraine headaches – is inherently subjective. The ALJ found that Hess was not credible with respect to the pain caused by her migraines and the resulting effect on her ability to work. The ALJ also found that Hess's two treating physicians, Dr. Banks and Dr. Abercrombie, were not credible on the bases that their opinions were based on Hess's subjective reports and because no objective medical tests supported their diagnoses of fibromyalgia.

The ALJ submitted Hess's RFC to a VE through interrogatories, and the VE reported that an individual with those restrictions could work as a laundry worker, bagger, or packer. The VE relied on the Dictionary of Occupational Titles and the Bureau of Labor Statistics and reported that hose jobs were available in the local and national economy, and the ALJ accepted that report. The ALJ ultimately found that Hess is "not disabled."

## ISSUES ON APPEAL

Hess, acting *pro se*, raises a number of issues on appeal. First, she argues that the ALJ failed to fully and fairly develop the record as to Hess's alleged impairments of fibromyalgia and chronic migraine headaches. Second, Hess argues that the ALJ failed to consider whether the combination of impairments qualifies as severe. Third, Hess contends that the ALJ failed to properly account for her limitations because he (a) improperly determined that she is not credible and (b) improperly discounted the opinions of Hess's treating physicians. Fourth, Hess argues that the ALJ's RFC determination failed to account for her expected absenteeism and environmental restrictions. Finally, Hess argues that the VE's testimony cannot amount to substantial evidence because it was based on a faulty RFC for the above reasons. Because I find that the ALJ made improper credibility determinations, I will remand without reaching the other arguments.

## DISCUSSION

## LEGAL STANDARDS

In a disability insurance benefits case, the burden is on the claimant to prove that he or she has a disability. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001). Under the Act, a disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or

can be expected to last for a continuous period of not less than 12 months."
42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A).  Additionally, the claimant will be
found to have a disability "only if his physical or mental impairment or
impairments are of such severity that he is not only unable to do his previous work
but cannot, considering his age, education and work experience, engage in any
other kind of substantial gainful work which exists in the national economy."
42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B); *see also Bowen v. Yuckert*, 482
U.S. 137, 140 (1987).

The Commissioner has promulgated regulations outlining a five-step process
to guide an ALJ in determining whether an individual is disabled.  First, the ALJ
must determine whether the individual is engaged in "substantial gainful activity."
If she is, then she is not eligible for disability benefits.  20 C.F.R. § 404.1520(b).
If she is not, the ALJ must consider step two, which asks whether the individual
has a "severe impairment" that "significantly limits [the claimant's] physical or
mental ability to do basic work activities."  20 C.F.R. § 404.1520(c).  If the
claimant is not found to have a severe impairment, she is not eligible for disability
benefits.  If the claimant is found to have a severe impairment the ALJ proceeds to
step three, in which he must determine whether the impairment meets or is equal to
one determined by the Commissioner to be conclusively disabling.  If the
impairment is specifically listed or is equal to a listed impairment, the claimant

will be found disabled. 20 C.F.R. § 404.1520(d). If the impairment is not listed or is not the equivalent of a listed impairment, the ALJ moves on to step four, which asks whether the claimant is capable of doing past relevant work. If the claimant can still perform past work, she is not disabled. 20 C.F.R. § 404.1520(e). If the claimant cannot perform past work, the ALJ proceeds to step five, in which the ALJ determines whether the claimant is capable of performing other work in the national economy. In step five, the ALJ must consider the claimant's "age, education, and past work experience." Only if a claimant is found incapable of performing other work in the national economy will she be found disabled. 20 C.F.R. § 404.1520(f); *see also Bowen*, 482 U.S. at 140–41 (explaining five-step process).

Court review of an ALJ's disability determination is narrow; the ALJ's findings will be affirmed if they are supported by "substantial evidence on the record as a whole." *Pearsall*, 274 F.3d at 1217. Substantial evidence has been defined as "less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision." *Id.* The court's review "is more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision, we also take into account whatever in the record fairly detracts from that decision." *Beckley v. Apfel*, 152 F.3d 1056, 1059 (8th Cir. 1998). The Court will affirm the Commissioner's decision as long as there is

substantial evidence in the record to support his findings, regardless of whether

substantial evidence exists to support a different conclusion. *Haley v. Massanari*,

258 F.3d 742, 747 (8th Cir. 2001).

In reviewing the Commissioner's decision, the Court must review the entire

administrative record and consider:

> 1. The credibility findings made by the ALJ.
> 2. The claimant's vocational factors.
> 3. The medical evidence from treating and consulting physicians.
> 4. The claimant's subjective complaints relating to exertional and non-exertional activities and impairments.
> 5. Any corroboration by third parties of the claimant's impairments.
> 6. The testimony of vocational experts when required which is based upon a proper hypothetical question which sets forth the claimant's impairment.

*Stewart v. Sec'y of Health & Human Servs.*, 957 F.2d 581, 585–86 (8th Cir. 1992)

(quoting *Cruse v. Bowen*, 867 F.2d 1183, 1184–85 (8th Cir. 1989)).

Credibility Determination

The ALJ found that Hess's statements regarding the intensity, persistence,

and limiting effects of her symptoms are not credible. When evaluating evidence

of pain or other subjective complaints, the ALJ is never free to ignore the

subjective testimony of the plaintiff, even if it is uncorroborated by objective

medical evidence. *Basinger v. Heckler*, 725 F.2d 1166, 1169 (8th Cir. 1984). The

ALJ may disbelieve a claimant's subjective complaints when they are inconsistent

with the record as a whole.  *See, e.g.*, *Battles v. Sullivan*, 902 F.2d 657, 660 (8th Cir. 1990).

In considering the subjective complaints, the ALJ is required to consider the factors set out by *Polaski v. Heckler*, 739 F.2d 1320 (8th Cir. 1984), which include: "(1) the claimant's daily activities; (2) the subjective evidence of the duration, frequency, and intensity of the claimant's pain; (3) any precipitating or aggravating factors; (4) the dosage, effectiveness and side effects of any medication; and (5) the claimant's functional restrictions."  *Masterson v. Barnhart*, 363 F.3d 731, 738 (8th Cir. 2004) (citing *Polaski*, 739 F.2d at 1322).  The ALJ need not discuss each *Polaski* factor as long as the he considers the analytical framework.  *Tucker v. Barnhart*, 363 F.3d 781, 783 (8th Cir. 2004).  When an ALJ explicitly finds that the claimant's testimony is not credible and gives good reasons for the findings, the court will usually defer to the ALJ's finding.  *Casey v. Astrue*, 503 F.3d 687, 696 (8th Cir. 2007).

The ALJ cites to portions of the record that show the headaches are not as severe as alleged.  For example, the ALJ notes that Hess stated in June 2009 that her headache intensity is "typically moderate."  Tr. 17 (citing Tr. 371)  However, the record as a whole shows that while Hess suffers more mild and moderate headaches than severe headaches, it is the severe headaches that are the alleged

source of disability.[16]  There is no inconsistency between Hess's description and what she now alleges.

The ALJ next states that Hess's testimony about her medication is inconsistent with the objective medical record.  The ALJ cites to medical records dated September 21, 2011, where it was noted that Hess had requested a "long-acting kenalog over the episodic high dose prednisone" and that the medication should work "as a preventative" and thereby reduce the more severe headaches and frequency of all headaches generally.  Tr. 17 (citing Tr. 528).  The ALJ fails to explain how this note creates any inconsistency with Hess's testimony.  Hess testified that the use of prednisone – though effective – was disfavored by her doctors; she also testified and that she took two different preventative medications.  Nothing in this paragraph supports the ALJ's credibility determination.

The ALJ questioned the validity of Hess's headache calendar.  The ALJ found that the treatment notes show that "the claimant never supplied her doctor with a headache log and denied keeping one."  Tr. 18.  The ALJ referenced the hearing and noted that Hess did not answer the ALJ's question of whether the headache log was scribed on the dates provided.  The ALJ found that the existence

---

[16] The ALJ acknowledged that the record shows Hess suffers between sixteen and eighteen less-severe headaches per month and two to four "migraine attacks" per month.  Tr. 19.

- 25 -

of the "headache log" was inconsistent with Hess's statements to Dr. Banks that she did not keep a log.

The ALJ correctly noted that Dr. Banks repeatedly reminded Hess to keep a headache diary and bring it to her appointments. Tr. 18 (citing *inter alia* Tr. 353). However, the ALJ's remaining statements regarding the headache log fail to address inconsistencies in the record. Hess testified at the hearing that she originally was not keeping her "headache diary" and then later began keeping one. She also testified that Dr. Banks had a "form," whereas she used her "calendar." The medical records themselves are very inconsistent with respect to whether Hess was keeping a "headache diary." As noted in detail above, there are numerous times where notes from the same treatment visit conflict. In addition, there is at least one entry regarding headache diaries that says Hess is "keeping track on her calendar." Tr. 375. The ALJ does not acknowledge this difference in terminology, despite Hess's testimony.

The ALJ makes several inferences from the medical records that she finds to be inconsistent with Hess's testimony. Unless the inferences are supported by opinions from treating or consultative experts, they do not constitute substantial evidence. *See Nevland v. Apfel*, 204 F.3d 853, 858 (8th Cir. 2000) ("An administrative law judge may not draw upon his own inferences from medical reports.") (quoting *Lund v. Weinberger*, 520 F.2d 782, 785 (8th Cir. 1975)).

First, the ALJ notes that after Hess stopped working, she reported experiencing "much less stress." Tr. 18 (citing Tr. 357). Because Hess had testified that stress increased the frequency and severity of her symptoms, the ALJ inferred that Hess's migraines should have decreased in frequency and severity following her exit from the workforce. The ALJ does not cite to any medical opinion supporting this inference. Indeed, the inference is contrary to the opinions provided by Drs. Abercrombie and Banks, who both opined that even "low stress" would trigger migraines or preclude work. Tr. 461, 575. The ALJ also failed to account for other potential causes of migraines, such as changes in barometric pressure accompanying cold and wet weather conditions.

Second, the ALJ cited to portions of the medical record that noted Hess's migraines were secondary to her menses, as they began when she was eighteen and occurred in conjunction with menstruation. Tr. 20 (citing Tr. 703). The ALJ inferred that Hess's migraines should have become less frequent following her hysterectomy. Not only is this inference unsupported by any medical evidence, it is directly contrary to the medical evidence of record. Discharge instructions from the Jefferson Memorial Hospital Emergency Department state that migraine headaches "may be caused by hormonal changes, emotional stress, and drugs such as birth control pills." Tr. 603. Hess has consistently been prescribed and taking Estradiol and Premarin – hormonal replacement therapy medications. The ALJ's

failure even to acknowledge this evidence seriously undermines her credibility determination.

Third, the ALJ noted that Hess stopped seeking emergency room treatment for her migraines, which the ALJ found to be indicative of lessened symptoms. The record does not show that the ALJ considered any possible alternatives for avoiding the emergency room, such as the availability of alternative treatment or cost. The ALJ also did not analyze any of the actual treatment obtained at the emergency room visits. A review of the record shows that Hess's emergency-room treatment consisted of Imitrex to stop an existing migraine, as well as anti-nausea and narcotic and NSAID pain medications, such as Demerol, morphine, and Toradol. However, the medical records show that Imitrex stopped working. The records also show that Hess's doctors advised against further use of narcotic or opiate pain relievers and NSAIDs. Moreover, Hess testified that she stopped seeking emergency room treatment after initiating treatment with Dr. Banks. Dr. Banks prescribed the same sorts of medications obtained at the emergency room: anti-nausea and migraine-abortives. There is simply no evidence that Hess's migraines improved.[17]

The ALJ found Hess's testimony to be inconsistent because she only made a single trip to the emergency room for migraine relief, as opposed to the "frequent"

_____

[17] The record as a whole shows that Hess consistently and frequently suffered severe migraines.

trips alleged.  The record does not support this finding, as there is evidence of at least nine trips to the emergency room for migraines.  Tr. 598, 623, 626, 658, 661, 679, 683, 700, 708, 721.

The ALJ correctly finds that Hess, at times, uses the phrase "migraine attacks" and "headache" interchangeably.  The ALJ cited to Hess's October 2010 treatment records, which reflect that Hess had two migraine attacks per month and sixteen "less severe headaches."  Tr. 480.  The ALJ contrasts that with the records from March 2011, where it is noted that Hess had sixteen "migraine attacks" per month and from June 2011, where it is noted that Hess had twenty "headache days" per month.  Tr. 501, 511.

However, the ALJ incorrectly concludes that Hess has at most between two and four debilitating migraines per month.  The ALJ cites to the narrative portions of the medical records without acknowledging that those records use different terminology in different portions of the record.  For example, in addition to the narrative portion, each record has a table listing "days ANY headache," "days with migraine attacks," and "days disabled due to headache."  *See, e.g.*, Tr. 479 (emphases in original).  An examination of the days disabled show a greater range than found by the ALJ:  4, 18, 18, 22, 10, 3, 18, 11, 2, 4, 8, 4, 6.  *See* Tr. 358–36; 480–32.  Even the narrative portions of the record show months where Hess had more than four debilitating migraines.  *See* Tr. 381 ("[S]ix days per month in bed

all day") (August 2009); Tr. 391 ( "[Hess has] been in bed 10 days in the past month plus two days not headache but just 'wiped out'") (October 2009); Tr. 412 ("She has fifteen days migraine per month.") (January 2010). The ALJ wholly failed to account for these portions of the record.

Where alleged inconsistencies upon which an ALJ relies to discredit a claimant's subjective complaints are not support by and indeed are contrary to the record, the ALJ's ultimate conclusion that the claimant's symptoms are less severe than she claims is undermined. *Baumgarten v. Chater*, 75 F.3d 366, 368–69 (8th Cir. 1996). Here, the ALJ's credibility determination is not supported by substantial evidence as a whole.

Additionally, although the ALJ found as part of her credibility determination that Hess suffered between two and four "migraine attacks" per month, the ALJ did not incorporate those difficulties into her RFC determination. This provides a second ground for remand. *See Moore v. Colvin*, 743 F.3d 1118, 1127 (7th Cir. 2014) ("[T]he ALJ should have at least included in the RFC determination the likelihood of missing work.").

The ALJ correctly noted that in a case such as this, where the alleged impairment is almost entirely based upon subjectivity, a proper credibility determination is essential. This determination affects all subsequent stages of the disability determination. I will remand so that unaddressed evidentiary conflicts

such as those set forth in this opinion may be resolved and so that additional medical testimony may be sought, if required to make a determination.

Usually when a claimant was improperly denied benefits, the case is remanded to the ALJ for further administrative proceedings. *Buckner v. Apfel*, 213 F.3d 1006, 1011 (8th Cir. 2000) (noting this is done out of "abundant deference to the ALJ") (quoting *Cox v. Apfel*, 160 F.3d 1203, 1210 (8th Cir. 1998)). Where the record shows overwhelming support for a finding of disability, however, the court may eschew remand and direct that benefits be granted. *Id.*

The record does not overwhelmingly support a finding of disability. As noted above, many of the medical records contain materially conflicting provisions. It remains necessary to remand for rehearing so that those conflicts may properly be resolved.

<u>Motion to Supplement the Record</u>

Because I remand under Sentence Four for rehearing, I need not reach Hess's motion to supplement the record. However, the parties should be allowed to supplement the record with any additional information that may assist the ALJ in making a determination as to whether Hess's impairments, both singly and in combination, render her disabled. This includes the fibromyalgia testing and other

medical evidence from Dr. Amanda Dehlendorf.[18]  In addition, the ALJ should

appropriately review and discuss the entire record as it relates to Hess's

impairments, re-evaluate the current evidentiary record, and consider ordering

consultative examinations to assist in determining Hess's disability status.  *See*

*Delrosa v. Sullivan*, 922 F.2d 480, 486 (8th Cir. 1991).

## CONCLUSION

For the foregoing reasons, the Court finds that substantial evidence does not

support the ALJ's determination that Hess was not disabled.  This case will be

remanded under Sentence Four for rehearing.

The Code of Federal Regulations permits the Appeals Council to direct the

analysis to a different ALJ "if the circumstances warrant."  20 C.F.R. § 405.301.

Although at least one reviewing court has given that direction,[19] I will decline to do

---

[18] These examinations occurred after the ALJ made the hearing decision.  However, they appear to be relevant to the status of Hess's fibromyalgia on or before the date of the ALJ's decision, insofar as they state Hess has been diagnosed with fibromyalgia "which has been managed by her Neurologist for the past three years."  *See Williams v. Sullivan*, 905 F.2d 214, 216 (8th Cir. 1990) (finding statement that patient suffered since early adulthood to provide sufficient temporal nexus).  Fibromyalgia was at issue before the ALJ, who rejected the claimed impairment due to the absence of any objective evidence.  Though this precise issue is not before me, this appears to be the quality of evidence that would normally be considered by the Appeals Council if timely submitted.  *Id.*

[19] *Bledsoe v. Colvin*, No. 1:14-CV-00011-SEB, 2014 WL 8183003, at *13 (S.D. Ind. Oct. 31, 2014) *report and recommendation adopted as modified*, No. 1:14-CV-00011-SEB, 2015 WL 1210400 (S.D. Ind. Mar. 17, 2015) ("[T]he multiple errors in the ALJ's decision lead the Court to direct the Commissioner, on remand, to refer this matter to a different ALJ for consideration of Plaintiff's claims.").

so.  I do caution that because credibility is such an important determination in this type of case, principles of fairness may warrant appointment of a new ALJ.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner denying benefits is reversed and this case is remanded to the Commissioner for further proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

**IT IS FURTHER ORDERED** that plaintiff Leigh Ann Hess's motion to supplement the record and remand [# 13] is denied as moot.

A separate judgment in accordance with this Order is entered this same date.

_____
CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE

Dated this 22nd day of September, 2015.